IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THOMAS WELSH and ANNE WELSH,<br><br>    Plaintiffs,<br><br>v.<br><br>SAFECO INSURANCE COMPANY OF AMERICA,<br><br>    Defendant. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>2:21-cv-00082-RJS-DBP<br><br>Chief Judge Robert J. Shelby<br><br>Chief Magistrate Judge Dustin B. Pead |

Plaintiffs Thomas and Anne Welsh bring suit against their former insurer, Defendant Safeco Insurance Company of America, over its decision to deny their claim for a total loss of their off-the-grid house. The Welshes' house was destroyed after a burglar broke in, stole some items, and set the house on fire. At the time of the fire, the house had not been occupied as a full-time residence for almost a year, although the Welshes had made several repairs in the preceding months to prepare for new tenants who were planning to move in.

In denying the claim, Safeco cited a general exclusion in the Welshes' Policy barring coverage for any losses sustained from fire or other damage caused by burglars if the property had not been occupied for more than sixty days immediately preceding the loss. The Welshes argue an exception to that exclusion applies because their house was being repaired in preparation for occupancy at the time of the loss. The Welshes asked Safeco to reconsider the denial based on their position that this exception applied, Safeco ultimately reached the same decision, and the Welshes brought four causes of action against Safeco in state court. Safeco later removed the action to this court.

Two pending motions are ripe for decision: the Welshes' Motion for Partial Summary Judgment[1] and Safeco's Motion for Summary Judgment.[2]  In the Welshes' Motion, they seek judgment as a matter of law that the loss of their house was covered under the plain terms of the Policy.[3]  Safeco in its Motion seeks summary judgment on all four of the Welshes' claims.[4]  For the reasons stated below, the Welshes' Motion is DENIED and Safeco's Motion is GRANTED.

## BACKGROUND[5]

The Welshes purchased the house at issue (the House) in 2013, initially using it as an "off the grid" vacation property.[6]  The House is located in Iron County, Utah,[7] whereas the Welshes' full-time residence is in Arizona.[8]  As an off-the-grid structure, the House did not have standard utility connections and was heated using a propane heater and wood stove.[9]  The House was also "plumbed with propane gas piping," which ran from a storage tank outside, into and through the House, and "connected directly" with the propane heater in the main room.[10]  In addition to the heater, three other appliances (the stove, refrigerator, and dryer) were all powered by the propane

---

[1] Dkt. 23.

[2] Dkt. 25.

[3] Dkt. 23 at 3.  Although the Welshes' Motion is captioned as a "Motion for Summary Judgment," on reading the requested relief, the Welshes seek judgment as a matter of law on only the merits of their contractual claim, leaving "the issue of damages to be determined at trial."  *See id.* at 1, 3.  Accordingly, the Welshes' Motion is properly construed as a Motion for Partial Summary Judgment, as they seek summary judgment on only one aspect of one claim.

[4] Dkt. 25 at 1.

[5] Unless otherwise indicated, the following facts are material and not genuinely in dispute.  They are drawn from the parties' summary judgment briefing and attached exhibits.  *See generally* Fed. R. Civ. P. 56(c).  In evaluating cross-motions for summary judgment, the court presents a "neutral summary of the facts."  *Stella v. Davis Cnty.,* No. 1:18-CV-002, 2019 U.S. Dist. LEXIS 163363, at *2 n.1 (D. Utah Sept. 23, 2019).  However, when addressing the merits of each motion in turn, the court will construe the facts favorably toward the respective nonmoving party.  *See id.* (citing *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012)).

[6] Dkt. 25 ¶¶ 1–2; Dkt. 23 ¶¶ 1–3.

[7] Dkt. 23 ¶ 1; Dkt. 25 ¶ 1.

[8] Dkt. 23 ¶ 8; *see* Dkt 28 at 2 (noting the Welshes do not dispute this and other facts for summary judgment purposes).

[9] Dkt. 25 ¶¶ 2–3; Dkt. 23 ¶ 2.

[10] Dkt. 25 ¶ 3; *see* Dkt. 23 ¶ 19 (describing "pipe connection inside the cabin" for propane).

system.[11]  The Welshes received propane deliveries and service at the property from AmeriGas,

a nationwide propane vendor.[12]

In August 2016, the Welshes began leasing the House as a long-term rental to local

college students.[13]  Around the same time, they purchased a Landlord Protection Policy (the

Policy) from Safeco with an initial term of one year, which was later renewed for a second term

through August 2018.[14]  The Policy lists several "general exclusions," under which losses

"caused directly or indirectly by any" of the listed scenarios are excluded from coverage,

"regardless of any other cause or event contributing concurrently or in any sequence to the

loss."[15]  One of the general exclusions from coverage (Exclusion 17) provides:

> 17.  Vandalism and malicious mischief, theft or attempted theft, damage by burglars, fire and any ensuing loss, including breakage of glass or safety glazing material, caused by any intentional and wrongful act committed in the course of the vandalism or malicious mischief, theft or attempted theft, if the Described Location:
>
>> a.  is rented or held for rental as a residence and has not been occupied as a residence for more than 60 consecutive days immediately before the loss. Occupied as a residence means the place where an occupant or occupants are living as a primary residence; or
>>
>> b.  is vacant for more than 60 consecutive days immediately before the loss.

---

[11] Plaintiffs' Opposition to Defendant's Motion for Summary Judgment (Dkt. 28) ¶ 6.  Safeco disputes this fact is material, and also asserts "it is undisputed . . . that each propane appliance in the house had its valve . . . such that [the Welshes] could have kept the gas off to each individual appliance but sill used every other appliance."  Safeco's Reply in Support of its Motion for Summary Judgment (Dkt. 31) at 6–7.  Safeco's factual clarification is noted, but it is not contrary to the Welshes' characterization of this fact.  The Welshes merely state that these appliances ran off the same propane system, and do not purport to claim they needed the propane heater to function.  *See* Dkt. 28 ¶ 6. Moreover, how the House's appliances were set up is material because viewing the system holistically is needed to properly understand how the propane heater fit within the broader conditions at the House.  Accordingly, Safeco's objection is without merit.

[12] Dkt. 25 ¶ 18; *see* Dkt. 23 ¶ 20 (describing AmeriGas as the Welshes' "propane provider").

[13] Dkt. 25 ¶ 4; Dkt. 23 ¶ 14.

[14] Dkt. 25 ¶ 5; Dkt. 23 ¶¶ 5–6.

[15] Ex. D to Safeco's Motion for Summary Judgment (Dkt. 23-4): Policy Documents for Safeco Policy No. OY7556226 at 8 [hereinafter Exclusion 17].

> This exclusion does not apply if the dwelling is under construction. A dwelling under construction includes being remodeled, reconstructed, renovated or repaired in preparation for occupancy as a residence at the time of the loss.[16]

In May 2017, the tenants who had been renting the House ended their lease.[17]  Guests then stayed at the House for two separate one-week periods in June and August of that year.[18] Following the August guests' departure, the Welshes determined several repairs were needed.[19] From August to October, they made multiple trips to the House to repair blinds, windows, and screens; replace the water pump; repair flood damage; replace a broken toilet; repair drywall; and repair damaged railings.[20]

During visits to the House in December 2017 and January 2018, the Welshes noticed significant issues with the propane heating system, which would require them to replace the heating unit.[21]  A replacement was necessary because the Welshes were planning to lease the property to a new group of student tenants.[22]  Replacing the unit was further necessary because, according to Mr. Welsh, the House's internal water system could not function properly at that

---

[16] *Id.* at 10.

[17] Dkt. 25 ¶ 10; Dkt. 23 ¶ 15.

[18] Dkt. 23 ¶ 17; *see* Dkt. 25 ¶ 11.

[19] Dkt. 25 ¶ 12.

[20] Dkt. 23 ¶ 13.  Safeco contends these facts are not material because "only repairs within 60 days of the fire could reinstate coverage under Exclusion 17," and since these repairs occurred outside this timeframe, they are not relevant to the summary judgment analysis.  Safeco's Opposition to the Welshes' Motion for Partial Summary Judgment (Dkt. 32) at 3.  Because Safeco's dispute incorporates legal argument, which would be improper when reciting the facts for purposes of summary judgment, the objection is not well-taken.  *See infra* LEGAL STANDARDS section.  Moreover, the condition of the house in the months leading up to the fire, as well as the repairs the Welshes made in that timeframe, are material to understanding the condition the house was in at the time of the fire, which is necessary to resolving the Cross-Motions.  Accordingly, because Safeco does not dispute that these repairs occurred as a factual matter, the court considers them both undisputed and material for purposes of resolving the Motions.

[21] Dkt. 25 ¶¶ 14–15.  Safeco asserts the same materiality challenge to these facts as the one articulated in the preceding note.  Dkt. 32 at 3.  For similar reasons as those articulated there, the objection is not well-taken.  The reasons and circumstances that led the Welshes to replace the heating unit are material to providing context in considering when and how the unit was eventually replaced.

[22] Dkt. 25 ¶ 16; *see* Dkt. 23 ¶ 21 (noting plans relating to the new heater revolved around new tenants moving in).

time of year without a functioning heating system.[23]  Although the new tenants had not set a specific move-in date, they were targeting late April 2018.[24]

Accordingly, Mr. Welsh returned to the property on March 8 or 9, 2018, to replace the broken unit with a new propane heater.[25]  The repair involved: (1) purchasing the new heater, (2) disconnecting the old heater from the pipe connection inside the House, and (3) connecting the new heater to the same connection point.[26]  The new tenants then visited the House twice, on March 27 and April 3, "to take pictures and begin moving in some of their items."[27]

On April 14, 2018, a man—unknown to the Welshes—broke into the House, stole a few items, and "used an accelerant to start a fire inside."[28]  The entire House and outbuildings burned to the ground, resulting in a "total loss."[29]  The man was later apprehended by the authorities and separate criminal proceedings against him ensued.[30]

The Welshes filed a claim with Safeco to recoup the loss of the House, which Safeco acknowledged in a letter dated May 1, 2018.[31]  This letter confirmed receipt of the claim, noted that Safeco could neither "confirm [n]or deny coverage for th[e] loss," and informed the Welshes

---

[23] Dkt. 28 ¶ 7.  Safeco objects to this fact, contending it is undisputed that the House "always had an operating heating system because it always had [a] 'very large' wood burning fireplace that 'threw out enough heat' to heat the entire house."  Dkt. 31 at 7 (quoting Ex. B to Safeco's MSJ: Deposition of Thomas Welsh (Dkt. 23-3) at 112:23–113:20 [hereinafter T. Welsh Depo.]).  Safeco's objection is noted, and as articulated above, for purposes of summary judgment the record indicates the water system needed a functioning heating system to operate in colder weather—whether it was heated by the wood-burning stove or the propane heater is immaterial.

[24] *See* Dkt. 25 ¶ 16; Dkt. 23 ¶ 21.

[25] Dkt. 25 ¶ 17; Dkt. 23 ¶ 19.

[26] Dkt. 23 ¶ 19; *see* Dkt. 25 ¶ 17.

[27] Dkt. 25 ¶ 20; *cf.* Dkt. 32 at 4 (not disputing this fact).

[28] Dkt. 23 ¶ 22; *see* Dkt. 25 at 1–2, 2 n.1.

[29] Dkt. 23 ¶ 22; *see* Dkt. 25 at 1–2.

[30] *See* Dkt. 25 at 2 n.1; Dkt. 23 at 23 n.3.

[31] Ex. J to Safeco's MSJ: May 1, 2018 Letter (Dkt. 23-10) [hereinafter May 1 Letter] at 1.

that Safeco would be investigating the claim.[32]  The May 1 Letter also pointed to Exclusion 17 of

the Policy as being "particularly applicable to th[e] claim."[33]

On May 8, Safeco denied the claim, citing Exclusion 17 in support.[34]  In explaining the

denial's rationale, the claims examiner stated:

> As you are aware, this claim arises from the total loss of your rental property due
> to an intentionally set fire. It is our understanding that on April 14, 2018 a man
> broke into your unoccupied rental property, reportedly ransacked the home, stole a
> machete that belonged to your son and then started a fire on the kitchen floor. . . .
>
> It is also our understanding, through discussions with you, that your rental property
> has not been occupied as a primary residence since July of 2017.
>
> . . . .
>
> As stated in [Exclusion 17], the policy does not cover any loss caused directly or
> indirectly by vandalism and malicious mischief, fire and any ensuing loss that
> occurs while the property has been unoccupied or vacant for 60 days prior to the
> loss. Therefore, according to the terms and conditions of your policy, we are unable
> to provide any coverage for this loss.[35]

The May 8 Letter concluded by stating that Safeco was "always open to reevaluating [its]

position, should new facts come to light," and encouraged the Welshes to submit "any additional

information" that might "have a material effect on [Safeco's] determination of coverage."[36]

A week later, the Welshes' insurance broker sent Safeco a lengthy email on their behalf,

asking the company to reconsider its decision and presenting several reasons why they believed

the loss was covered under the Policy.[37]  The email reviewed the House's history under the

Welshes' ownership, suggested that the previous tenants had caused extensive damage, and

---

[32] *Id.* at 1.

[33] *Id.* at 1–2.

[34] Ex. K to Safeco's MSJ: May 8, 2018 Letter (Dkt. 23-11).

[35] *Id.*

[36] *Id.* at 2.

[37] Ex. L to Safeco's MSJ: May 17, 2018 Email and Attached Documents (Dkt. 23-12) [hereinafter Reconsideration Email & Attachments].

asserted that, as a result, the House had "been in an ongoing state of repairs in preparation for new tenants since July of 2017."[38]   The email also noted that the Welshes had made twelve separate trips to complete the needed repairs, and attached documents detailing the damages caused by the prior tenants, as well as the repairs conducted on each trip to the House.[39]   The email concluded by asserting the loss fit into the exception found at the end of Exclusion 17, contending "[i]t is clear this property was temporarily unoccupied and in the course of repairs in preparation for occupancy and was not vacant at the time of the loss."[40]

Safeco reaffirmed its denial in a letter dated May 23, 2018.[41]   The May 23 Letter confirmed receipt of the reconsideration request and the attached documents, but on reviewing them "concluded that [Safeco's] position regarding coverage for [the] loss remains the same."[42] The Letter acknowledged the exception found at the end of Exclusion 17, but stated it did not apply to the House because:

> [T]here was no substantial or continuing construction performed for several months leading up to 60 days immediately before the loss. With the exception of the propane heater[,] which was replaced on March 9, 2018, after having difficulty starting in the fall of 2017 and by January 2018 would not start, there is no documented substantial and continuing activity at the premises between October 2017 and the April 14, 2018 date of loss, nor was anyone occupying the premises during that time. Therefore, according to the terms and conditions of your policy, we are unable to provide any coverage for this loss.[43]

On December 16, 2020, the Welshes sued Safeco in the State of Utah's Third Judicial District Court.[44]   Their Complaint states claims for (1) breach of contract; (2) intentional

---

[38] *Id.* at 1.

[39] *Id.* at 1, 21–22, 28–29.

[40] *Id.* at 2.

[41] Ex. M to Safeco's MSJ: May 23, 2018 Letter (Dkt. 23-13) [hereinafter May 23 Letter].

[42] *Id.* at 1.

[43] *Id.* at 2.

[44] Dkt. 1-1 (Complaint); *see also* Notice of Removal (Dkt. 1) ¶ 1.

infliction of emotional distress; (3) negligent infliction of emotional distress; and (4) negligent misrepresentation.[45]  Safeco removed the action to this court on February 8, 2021.[46]

Safeco filed its Motion for Summary Judgment on May 6, 2022, seeking judgment as a matter of law on all four of the Welshes' claims.[47]  The Welshes then filed their Motion for Partial Summary Judgment on May 20, seeking judgment as a matter of law that the loss of their House was "cover[ed] under the plain language of the Policy," while leaving all other issues to be resolved at trial.[48]  After the Cross-Motions were fully briefed, Safeco filed an Objection to a piece of evidence the Welshes attached to their Reply in support of their Motion (First Objection).[49]  Following a Response from the Welshes submitting a complete version of the exhibit at issue,[50] Safeco filed a second Objection to that more complete exhibit (Second Objection).[51]  Having heard oral argument from the parties on December 13,[52] the Cross-Motions and both Objections are now ripe for decision.

---

[45] Dkt. 1-1 ¶¶ 42–67.  The Welshes' Complaint on its face appears to only assert three causes of action, stating the allegations supporting negligent infliction of emotional distress and intentional infliction of emotional distress under a single "claim for relief."  *See id.* ¶¶ 54–61.  But in the summary judgment briefing, the parties appear to consider these as two separate claims.  *See* Dkt. 23 at 18–23; Dkt. 28 at 15–18.  Accordingly, the court will treat these as two separate claims and considers the Welshes as stating a total of four causes in their Complaint.

[46] Dkt. 1.

[47] Dkt. 23 at 1.

[48] Dkt. 25 at 3.  As noted, although the motion is captioned as a "Motion for Summary Judgment," it is really a Motion for Partial Summary Judgment, and the court therefore considers it as such.  *See supra* note 3.

[49] Safeco's Objection to New Evidence Offered in Plaintiffs' Reply (Dkt. 34).

[50] Response to Safeco's Evidentiary Objection (Dkt. 35); *see also* Declaration of Thomas Welsh (Dkt. 36); Revised General Terms and Conditions of AmeriGas Propane, L.P. (Dkt. 36-1).

[51] Safeco's Objection to New Evidence Offered in Plaintiffs' Response to Safeco's Evidentiary Objection (Dkt. 40).

[52] *See* Minute Entry for December 13, 2022 Hearing (Dkt. 49).

## LEGAL STANDARDS

This matter is before the court on federal diversity jurisdiction.[53] "Because this is a diversity case, substantive issues are controlled by state law and procedural issues are controlled by federal law."[54] Thus, the Federal Rules of Evidence govern Safeco's evidentiary objections,[55] and federal standards guide the court in resolving the parties' respective burdens on summary judgment,[56] but Utah law governs the analysis of the underlying claims.[57]

Courts grant summary judgment when "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law."[58] A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[59]

In considering a motion for summary judgment, the court is to "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party."[60] In so doing, the court's "function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[61] "Credibility determinations, the

---

[53] *See* Dkt. 1 ¶ 5 ("Safeco bases its removal on diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.")

[54] *Burnham v. Humphrey Hosp. Reit Trust, Inc.*, 403 F.3d 709, 712 (10th Cir. 2005) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

[55] *See Griego v. State Farm Mut. Auto. Ins. Co.*, 839 Fed. App'x 258, 262 (10th Cir. 2020) ("The Federal Rules of Evidence generally govern the admissibility of evidence in a diversity lawsuit." (citing *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 877 (10th Cir. 2006))).

[56] *See Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1194–95 (10th Cir. 2002) ("[A] federal court sitting in diversity will be guided by federal-law standards governing summary judgment procedure.").

[57] *See Prager v. Campbell Cnty. Mem'l Hosp.*, 731 F.3d 1046, 1060 (10th Cir. 2013) ("In diversity cases, the substantive law of the forum state governs the analysis of the underlying claims, including specification of the applicable standards of proof, but federal law controls the ultimate, procedural question whether judgment as a matter of law is appropriate." (quoting *Haberman v. Hartford Ins. Grp.*, 443 F.3d 1257, 1264 (10th Cir. 2006)).

[58] Fed. R. Civ. P. 56(a).

[59] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[60] *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

[61] *Liberty Lobby*, 477 U.S. at 249.

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."[62]  Thus, the court must ascertain whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[63]

"Cross-motions for summary judgment are to be treated separately; denying one does not require granting another."[64]  Each "moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment."[65]  When brought by a defendant, the defendant carries "both the initial burden of production . . . and the burden of establishing that summary judgment is appropriate as a matter of law" even though it "does not have the ultimate burden of persuasion at trial."[66]  In such circumstances, "[j]udgment as a matter of law is appropriate when the [defendant proves the plaintiff] has failed to make a sufficient showing on an essential element of his or her case."[67]

When a plaintiff moves for summary judgment, "a more stringent summary judgment standard applies" because plaintiffs carry the ultimate burden of persuasion at trial.[68]  Thus, the court "must view the evidence presented through the prism of the substantive evidentiary burden."[69]  Further, to obtain summary judgment, the plaintiff "must establish, as a matter of law, all essential elements of the issue."[70]

---

[62] *Id.* at 255.

[63] *Id.* at 249.

[64] *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

[65] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (internal quotation marks and citations omitted).

[66] *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002) (citation omitted).

[67] *City of Albuquerque*, 667 F.3d at 1122 (internal quotation marks and citation omitted).

[68] *Pelt*, 539 F.3d at 1280.

[69] *Liberty Lobby*, 477 U.S. at 254.

[70] *Pelt*, 539 F.3d at 1280 (internal citations and quotation marks omitted).

## ANALYSIS

The Welshes seek judgment as a matter of law on their contract claim, asking the court to rule that the loss of their property was "cover[ed] under the plain language of the Policy."[71] Their Motion also states they wish to reserve the issue of damages for resolution at trial, but is silent as to their remaining claims.[72]  In Safeco's Motion, it seeks judgment as a matter of on all issues in the case based on the Welshes' inability to carry their burden on any of their claims.[73]

As a threshold matter, the court must first resolve two objections Safeco raises—initially objecting to certain evidence submitted by the Welshes in support of their Motion, and additionally objecting to evidence the Welshes submitted in response to Safeco's First Objection.[74]  After analyzing the arguments raised in Safeco's Objections, and finding them unavailing, the court then addresses the issues raised in the Cross-Motions.  There is significant overlap in addressing the parties' positions on the contract claim since both parties assert the text of the Policy is dispositive based on the undisputed material facts in the record.  Accordingly, the court will analyze the Cross-Motions together as to the contract claim, then address Safeco's Motion as to the Welshes' remaining claims.

## I.    Safeco's Evidentiary Objections Are Overruled

In its First Objection, Safeco challenges the court's ability to consider a portion of the Terms and Conditions governing the Welshes' service agreement with AmeriGas (the Terms).[75] Safeco asserts the Terms cannot be considered on summary judgment because the document is "new evidence" that was not attached to the Welshes' Motion, and it was produced in incomplete

---

[71] Dkt. 25 at 3.

[72] *See id.*

[73] Dkt. 23 at 1.

[74] *See* First Objection; Second Objection.

[75] *See generally* First Objection.

form.[76]  In responding to Safeco's First Objection, the Welshes argue the excerpt was attached to their Reply only in response to Safeco attacking the factual basis of testimony from Mr. Welsh, and the Terms support the assertions in his testimony.[77]  In addition, the Welshes attached the full Terms to their Response, which Safeco then attacked in a Second Objection as also being improper "new evidence" the court is unable to consider on summary judgment.[78]  The Welshes in turn counter that they produced the entire Terms only to respond to concerns Safeco raised in its First Objection.[79]  For the following reasons, both Objections are overruled.

The dispute arises from a statement of fact in the Welshes' Motion, where they assert that "before the new heater could be used, [the Welshes] were required to have the connection between the new heater and the gas plumbing inspected" by AmeriGas "to certify that the connection was secure and that no gas would leak."[80]  In support of this fact, the Welshes cite deposition testimony from Mr. Welsh,[81] in which he described the typical process where they would schedule AmeriGas to "come out to the property in the spring, fill up the gas tank, and they would check all the connections and they would . . . light the pilot light in the water heater, the stove, the oven, the refrigerator, and if we wanted it, on the propane heater."[82]  Mr. Welsh also described the family's "contract" with AmeriGas, which he stated "has a stipulation in it that any time you break into the gas line, disconnect, or reconnect any appliances that have been disconnected, they have to come inspect it" to ensure there is not a gas leak.[83]  Mr. Welsh also

---

[76] *Id.* at 1, 3.

[77] *See generally* First Response.

[78] Second Objection at 1.

[79] *See generally* Plaintiffs' Response to Safeco's Second Objection (Dkt. 42) [hereinafter Second Response].

[80] Dkt. 25 ¶ 18.

[81] *See id.* at 6 n.22.

[82] T. Welsh Depo. at 107:21–108:22.

[83] *Id.* at 111:10–19.

testified that once a "specific date" had been set for the new tenants to move in, he would have notified their regular point of contact to set up a time for the system to be inspected, either around the time the new tenants were set to move in or "soon thereafter."[84]

Safeco disputed these facts in its Opposition, arguing the Welshes submitted no evidence "that such an inspection really was 'required,' let alone that any 'certification' was also 'required.'  [The Welshes] produced no AmeriGas service agreement or other time-relevant documents."[85]  Safeco also attacked Mr. Welsh's testimony as "self-serving."[86]

Responding to these arguments, the Welshes attached a portion of AmeriGas's Terms to their Reply brief[87] and pointed out that they produced the same excerpt to Safeco in responding to one of its discovery requests.[88]  The operative language is found in two subsections of Section 3 of the Terms, which provide:

> **B. Propane System Maintenance & Repair.** Except for the Leased Equipment, you are responsible for the maintenance and repair of your entire propane system. You are required to notify us in the event that you disconnect the propane system or add or remove appliances so that we may conduct a leak check on the Leased Equipment.
>
> . . . .
>
> **D. Access to Equipment.** You agree that the Company has an irrevocable right of entry and exit to your property, without prior notice, to deliver propane or to install, repair, service, or remove the Leased Equipment, or to perform any other services that the Company deems reasonably necessary. You agree to provide the Company with safe, free and unimpeded access . . . .[89]

---

[84] *Id.* at 118:21–119:24.

[85] Dkt. 32 at 3–4.

[86] *Id.* at 3.

[87] Ex. 2 to Plaintiffs' Reply: Excerpt of AmeriGas Terms and Conditions (Dkt. 33-2).

[88] Plaintiffs' Reply in Support of their Motion for Summary Judgment (Dkt. 33) at 4–5.

[89] Revised General Terms and Conditions of AmeriGas Propane, L.P., Relating to the Supply of Propane and Lease of Propane Related Equipment to Residential Customers, filed as Exhibit to Affidavit of T. Welsh (Dkt. 36-1) [hereinafter AmeriGas T&Cs] § 3(B), (D).

In its First Objection, Safeco presents several reasons why, under the Federal Rules of Evidence, the partial Terms should be ruled inadmissible.  First, Safeco asserts it is "a textbook example of inadmissible hearsay."[90]  The Welshes counter that it is not hearsay because it is a part of a contract they had with AmeriGas and therefore is a "verbal act" of legal significance, not an out-of-court statement.[91]  On this point, the Welshes are correct.

Hearsay is an out-of-court statement a party offers to prove the truth of what is asserted in the statement.[92]  Such evidence is generally inadmissible unless an exception or exclusion applies, or if the party seeks to use it for a non-hearsay purpose.[93]  The Tenth Circuit has held that contracts are "not excludable as hearsay" because they generally "constitute[] an act of legal significance . . . , not a 'statement' offered for its truth."[94]  This conclusion makes sense, because the Federal Rules of Evidence define a "statement" in the hearsay context as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."[95]  A contractual provision thus does not meet this definition because it is not intended as an assertion. The Fifth Circuit, in dismissing a similar argument, further expanded on the reasons why a contract is not hearsay:

> A contract is a verbal act.  It has legal reality independent of the truth of any statement contained in it. . . . The admission of a contract to prove the operative fact of that contract's existence thus cannot be the subject of a valid hearsay objection.  To introduce a contract, a party need only authenticate it.

---

[90] First Objection at 2.

[91] First Response at 4.

[92] Fed. R. Evid. 801(c).

[93] *See id.* R. 802.

[94] *Cagle v. James St. Grp.*, 400 Fed. App'x 348, 356 (10th Cir. 2010) (citing *Schindler v. Seiler*, 474 F.3d 1008, 1010-11 (7th Cir. 2007)); *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992); Fed. R. Evid. 801(a)).

[95] *See* Fed. R. Evid. 801(a).

The Terms are part of the Welshes' service agreement with AmeriGas, and therefore its admissibility is no different than the admissibility of any other contract. The Terms do not qualify as a "statement," but rather constitute text of legal significance memorializing the obligations of AmeriGas and its customers vis-à-vis their contractual relationship. Accordingly, the Terms are not excludable as hearsay.

Next, Safeco argues the excerpt of the Terms "lacks foundation and cannot be authenticated."[96] The Welshes counter that full authentication is not required at the summary judgment stage and, even if it was, it will be possible to authenticate the excerpt of the Terms at trial.[97] Under Federal Rule of Evidence 901, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."[98] The rule goes on to provide a non-exhaustive list of evidence that can meet this requirement, including testimony of a witness with knowledge "that an item is what it claims to be."[99] At summary judgment, "a court necessarily may consider only the evidence that would be available to the jury," but "this does not mean [the] evidence must be submitted in a form that would be admissible at trial."[100] Rather, the proponent only needs to "show that it will be possible to put the information, the substance or content of the evidence, into an admissible form."[101]

The Welshes argue they were parties to the agreement containing the AmeriGas Terms, and Mr. Welsh can—and already did—testify about the existence of the Terms and what they

---

[96] Second Objection at 4.

[97] First Response at 5–6.

[98] Fed. R. Evid. 901(a).

[99] *Id.* R. 901(b)(1).

[100] *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quotation simplified).

[101] *Id.* (quoting 11 James Wm. Moore et al., *Moore's Federal Practice—Civil* § 56.91 (3d ed. 2015)).

require.[102]  The Welshes also contend that if Safeco disputes the authenticity of the Terms the Welshes produced in discovery, it may call an AmeriGas representative as its own witness to confirm the authenticity.[103]  The Welshes are correct.  Mr. Welsh has already testified to the existence of the Terms, and when producing the full Terms they were attached to a sworn declaration by Mr. Welsh providing facts that support their authenticity.[104]  This is sufficient to "show that it will be possible to put [the Terms] into an admissible form" at trial.[105]  Therefore, the Terms are appropriately considered at the summary judgment stage.

The third basis on which Safeco challenges the excerpt of the Terms is that they are incomplete, violating Federal Rule of Evidence 106.[106]  That rule provides that if only part of a "writing" is introduced, the other party "may require the introduction, at that time, of any other part . . . that in fairness ought to be considered at the same time."[107]  Thus, the opposing party's "remedy" at the summary judgment stage for a violation of Rule 106 "is introduction of the missing material and not exclusion of the partial material."[108]

Here, the Welshes argue they have remedied any violation by producing the entirety of the Terms in response to Safeco's First Objection.[109]  Yet in its Second Objection, Safeco attempts to preclude acceptance of the full Terms because the full document was not disclosed or provided during discovery.[110]  Therefore, Safeco contends the court "should not consider the

---

[102] First Response at 5.

[103] *Id.*

[104] *See* Dkt. 36.

[105] *See Perez*, 835 F.3d at 1232.

[106] First Objection at 3.

[107] Fed. R. Evid. 106.

[108] *See Lopez v. Delta Int'l Mach. Corp.*, 312 F. Supp. 3d 1115, 1155 (D.N.M. 2018).

[109] Second Response at 1–2; *see* Dkt. 36-1.

[110] Second Objection at 2–5.

Terms and Conditions in resolving the parties' summary judgment motions."[111]  The Welshes

take umbrage at this contention, responding that they only produced the complete document in

response to Safeco's First Objection, and that they do not need the full content of the Terms to be

considered on its substance to resolve the summary judgment issues—only to bolster facts

presented in Mr. Welsh's testimony in responding to arguments Safeco has raised.[112]

Safeco cannot have it both ways.  As noted, the appropriate remedy to a Rule 106-based

challenge is to produce the full version of the document at issue, not to exclude the incomplete

version.[113]  This general rule—plus the Welshes clarification that they do not require the

substance of the full Terms to resolve their position on summary judgment, only to rectify any

prejudice to Safeco from admitting only the excerpt—supports admission.  Safeco's arguments

as to the belated production are also unavailing, as the Welshes produced the excerpt during

discovery, and only produced the full version in response to Safeco's Objections—not to support

the merits of their summary judgment positions.

Accordingly, the excerpt of the Terms is admissible for the purpose the Welshes have

produced it: to counter arguments in Safeco's Opposition by bolstering the cited deposition

testimony from Mr. Welsh that the Welshes were required to notify AmeriGas when connecting

a new appliance to the system so that AmeriGas could "conduct a leak check" at the property.

And the full version of the Terms is admitted for purposes of satisfying Rule 106.  But, in

resolving the issues presented on summary judgment, the court will not consider the substance of

the full Terms aside from what is found in the excerpt.

---

[111] *Id.* at 3.

[112] Second Response at 1–2.

[113] *See* Fed. R. Evid. 106; *Lopez*, 312 F. Supp. 3d at 1155.

## II.    Based on the Plain Language of Exclusion 17, Safeco is Entitled to Summary Judgment on the Welshes' Contract Claim

"Insurance policies are generally interpreted according to rules of contract interpretation."[114]  Under Utah law, "[t]he interpretation of a contract is a matter of law for the court to determine unless the contract is ambiguous and evidence of the parties' intent (which is a matter of fact) is necessary to establish the terms of the contract."[115]  The existence of an ambiguity is itself a question of law, but the court cannot recognize an ambiguity on its own volition.[116]  The parties must argue that a provision is ambiguous and present competing definitions of the term at issue before the court can conclude there is an ambiguity and send the issue to the jury.[117]  "[A] contract provision is not necessarily ambiguous just because one party gives that provision a different meaning than another party does. To demonstrate ambiguity, the contrary positions should each be tenable."[118]

"Utah has a longstanding commitment to 'the principle that insurance policies should be construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purposes of insurance.'"[119]  Thus, where there is "ambiguity, uncertainty, or doubt, the terms of an insurance contract will be construed strictly against the insurer"[120] and "in favor of

---

[114] *Utah Farm Bureau Ins. Co. v. Crook*, 1999 UT 47, ¶ 5, 980 P.2d 685.  As noted, a federal court sitting in diversity applies state substantive law to resolve the underlying claims on summary judgment.  *See supra* LEGAL STANDARDS section.  In addition, although the Policy itself is silent to the governing law, *see generally* Dkt. 23-4, the parties appear to agree Utah law governs the Welshes' contract claim, *see, e.g.*, Dkt. 25 at 8–10; Dkt. 32 at 7–8.

[115] *Saunders v. Sharp*, 806 P.2d 198, 200 (Utah 1991).

[116] *WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 22, 54 P.3d 1139.

[117] *See R & R Energies v. Mother Earth Indus.*, 936 P.2d 1068, 1074 (Utah 1997).

[118] *R & R Energies*, 936 P.2d at 1074 (quoting *Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990)).

[119] *Poulsen v. Farmers Ins. Exch.*, 2016 UT App 170, ¶ 9, 382 P.3d 1058 (quoting *United States Fid. & Guar. Co. v. Sandt*, 854 P.2d 519, 521 (Utah 1993)).

[120] *Id.* (quoting *P.E. Ashton Co. v. Joyner*, 406 P.2d 306, 308 (Utah 1965)).

coverage."[121]  But where there is no ambiguity, and the parties each assert the policy's plain language supports their respective positions, there is no presumption in favor of the insured and the court interprets the disputed language as a matter of law.[122]

In opposing Safeco's Motion and in support of their Motion, the Welshes present several reasons why the Exclusion 17's "under construction" exception might apply to afford them coverage.  First, the court addresses the Welshes' belatedly raised argument that there is an ambiguity in the exception such that it must be construed in favor of coverage.[123]  After finding the Welshes have not established any of the operative language is ambiguous, the court next reaches the Welshes' primary argument that the plain meaning of "being . . . repaired . . . at the time of the loss" entitles them to coverage on the undisputed facts here.[124]  And lastly, the court addresses the Welshes' arguments that a repair "resets" the 60-day vacancy timeline set forth in the main text of Exclusion 17.[125]  For the reasons explained below, none of these arguments are availing.

A.  Because the Welshes Have Not Presented Two Competing Reasonable Interpretations of Disputed Language, They Are Unable to Show an Ambiguity in Exclusion 17

The parties do not dispute that Exclusion 17 as a whole applies to determine coverage for the loss of the Welshes' House.  Their disagreement stems from whether the "under construction" exception to that Exclusion applies.  The relevant text is found at the end of Exclusion 17 and provides: "This exclusion does not apply if the dwelling is under construction.

---

[121] *Id.* (quoting *Sandt*, 854 P.2d at 522).

[122] *See Muir v. Cincinnati Ins. Co.*, 2022 UT App 80, ¶ 9, 514 P.3d 586 ("[I]f a policy is not ambiguous, no presumption in favor of the insured arises and the policy language is construed according to its usual and ordinary meaning." (quoting *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993)); *see also Mellor v. Wasatch Crest Mut. Ins. Co.*, 2009 UT 5, ¶ 7, 201 P.3d 1004 ("Questions of contract interpretation . . . confined to the language of the contract itself are questions of law.").

[123] Dkt. 33 at 8–11.

[124] Dkt. 25 at 10–11.

[125] Dkt. 28 at 14; Dkt. 33 at 7.

A dwelling under construction includes being remodeled, reconstructed, renovated or repaired in preparation for occupancy as a residence at the time of the loss."[126]

In most of the summary judgment briefing, both parties initially contended that Exclusion 17's "plain language" works in their respective favor.[127]  However, in the Reply to their Motion, the Welshes for the first time advanced an argument that Exclusion 17 is ambiguous, and should therefore be construed in favor of coverage.[128]  Again at oral argument, counsel for the Welshes repeated the assertion that Exclusion 17 is ambiguous, attempting to inject into the analysis what the Welshes thought was being covered when they procured the Policy.  But evidence of the parties' intent when forming a contract comes into play only when the court first makes the threshold finding that there is an ambiguity.[129]  And here, based on the arguments presented, the Welshes have not established an ambiguity.

When interpreting a disputed provision of an insurance policy, only language that is ambiguous because it is "fairly susceptible to different interpretations should be construed in favor of coverage."[130]  *Poulsen v. Farmers Insurance Exchange*,[131] a case the Welshes cite repeatedly,[132] is instructive in this regard.  There, the plaintiffs sustained water damage from a storm in the midst of replacing their roof.[133]  But their insurance policy covered only damage

---

[126] Exclusion 17.

[127] Dkt. 25 at 8–11; Dkt. 28 at 11–12; Dkt. 31 at 8–13.

[128] Dkt. 33 at 8–11.

[129] *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994 ("When interpreting a contract, [courts'] task is to ascertain the parties' intent.  And the best indication of the parties' intent is the ordinary meaning of the contract's terms.  Accordingly, if the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." (quotation simplified)).

[130] *See Sandt*, 854 P.2d at 522.

[131] 2016 UT App 170.

[132] *See* Dkt., 25 at 8 n.32, 12 n.50; Dkt. 28 at 6 n.26; Dkt. 33 at 9 n.30, 11 n.44.

[133] *Poulsen*, 2016 UT App 170, ¶ 4.

from water "entering through an opening in the roof," and therefore did not cover damage if there was not a "roof" on the structure at the time of the storm.[134]  The plaintiffs argued the word "roof" was ambiguous and that the lower court had erred in granting summary judgment to the insurer because their roof being "in a partial state of completion" could qualify as a "roof" for purposes of the policy.[135]  The Utah Court of Appeals rejected this argument, finding that "the word 'roof' in [an insurance] policy is not fairly susceptible to interpretation as meaning an incomplete roof."[136]  Therefore, the court held there was no ambiguity in the policy's use of the word "roof" and interpreted the term according to its ordinary meaning.[137]

Similar to the plaintiffs in *Poulsen*, the Welshes have not offered a reasonable alternative interpretation of Exclusion 17 from the plain meaning of the relevant terms.  To start, the Welshes initially appeared to argue the language of Exclusion 17 was clear and unambiguous. Indeed, prior to their Reply, the Welshes focused solely on the "plain language" of the policy, citing several dictionary definitions of the words used in Exclusion 17.[138]  Safeco apparently accepted the accuracy of the proffered dictionary definitions for purposes of a plain meaning analysis.[139]  But for the first time in Reply, the Welshes purported to present an alternative argument that "even if the policy is ambiguous, it must be resolved in favor of coverage."[140]  Yet, in so doing, they merely "incorporated by . . . reference" their prior briefing.[141]  And on

---

[134] *Id.* ¶¶ 2–3.

[135] *Id.* ¶¶ 10–11.

[136] *Id.* ¶ 12.

[137] *Id.* ¶ 13.

[138] *See* Dkt. 25 at 10 & nn. 40–41; Dkt. 28 at 11 & nn. 59–60.

[139] *See* Dkt. 32 at 13 ("Even accepting Plaintiffs' dictionary definitions of 'repair,' Plaintiffs' simple heater exchange does not qualify as a repair to the 'dwelling.'").

[140] Dkt. 33 at 8 (quotation simplified).

[141] *Id.* at 9.

examination, the cited prior briefing focuses on whether the loss of the House was covered under the plain meaning of the policy, and does not suggest the language is in any way ambiguous.[142]

The issue of ambiguity was also addressed at length during oral argument, and counsel for the Welshes maintained that the parties had presented reasonable competing interpretations sufficient to create an ambiguity. When pressed on whether there was an exact word or phrase the parties disagreed on, the Welshes' counsel suggested the parties had presented competing definitions of "at the time of the loss." Yet this contention is not borne out in the briefing. On examining where the phrase "at the time of the loss" is discussed in the Welshes' briefing, it is clear they do not propose a definitive interpretation of what they think this phrase means apart from its plain meaning. Instead, their briefing on this phrase focuses on whether, factually speaking, coverage is afforded by the "under construction" exception,[143] or how reading it under its plain and ordinary reading leads to "absurd results."[144]

Thus, the core of the dispute is that the Welshes contend the House was "being . . . repaired . . . at the time of the loss" based on specific facts in the record, whereas Safeco disagrees. In essence then, the Welshes are arguing for a different application of the plain terms of Exclusion 17 to the facts of this case than the application argued by Safeco, which is not the same thing as proposing a competing interpretation of what is meant by the language used in Exclusion 17.[145] In any event, even if there is a proposed interpretation of "at the time of the loss" somewhere in the Welshes' briefing that differs from those words' ordinary meaning, it is

---

[142] *See id.* at 9 n.31 (citing Dkt. 25 at 8–11; Dkt. 28 at 6–15).

[143] *See, e.g.*, Dkt. 25 at 2 (contending that the "repair of the heating system was still pending at the time of the [fire] as AmeriGas . . . had not yet inspected and certified the gas connection"); Dkt. 33 at 6 ("In the event the Court finds that the 60-day clock did not reset when the repair was performed, the repair was ongoing at the time of loss, and the loss should have been covered.").

[144] Dkt. 28 at 13–14; *see also* Dkt. 33 at 5–6.

[145] *See Alf*, 850 P.2d at 1274–75 ("[P]olicy terms are not necessarily ambiguous simply because one party seeks to endow them with a different interpretation according to his or her own interests.").

not articulated in a way that would allow Safeco a meaningful chance to respond with a competing definition of its own.[146]  In other words, as with the plaintiffs in *Poulsen*, the Welshes have not raised the issue that "at the time of the loss" is "fairly susceptible to different interpretations," which means they have not established the phrase is ambiguous.[147]

Notwithstanding Plaintiffs' contention at oral argument, the court is not presented with two competing interpretations of Exclusion 17 sufficient to create an ambiguity.  Indeed, the Welshes have not sufficiently identified any particular term which they and Safeco define differently, arguing at bottom only that they possess competing visions of whether certain terms render the loss covered based on the facts of this case.  Without two competing reasonable definitions of specific disputed language, there is no ambiguity, and the court will apply the plain language of Exclusion 17.

B.  Based on the Plain Language and Structure of Exclusion 17, the Loss Was Not Covered Under the Policy

The "under construction" exception provides that Exclusion 17 "does not apply if the dwelling is under construction," which is in turn defined to include "being . . . repaired in preparation for occupancy as a residence at the time of the loss."[148]  Safeco argues that (1) no reasonable jury would consider the replacement of the propane heater a "repair" as that word is commonly understood, and (2) even if they did find it to be a repair, because it was replaced more than a month prior to the fire, the House was not "being . . . repaired . . . at the time of the

---

[146] *See Deseret Trust Co. v. Unique Inv. Corp.*, No. 2:17-cv-00569, 2018 U.S. Dist. LEXIS 239267, at *9 (D. Utah July 2, 2018) (noting the District of Utah "ordinarily does not consider arguments raised for the first time in a reply brief or at oral argument" (citing DUCivR 7-1(b)(2))); *see also id.* at *9–10 (observing "[f]ederal district courts around the nation follow a similar practice, rejecting arguments raised for the first time at oral argument" and collecting cases).

[147] *See Poulsen*, 2016 UT App 170, ¶¶ 9–14; *see also Sandt*, 854 P.2d at 522.

[148] Exclusion 17.

loss."[149]  The Welshes disagree with both propositions, arguing (1) the unique nature of their off-the-grid house means that replacement of the propane heater was a necessary repair to make it habitable for tenants, and (2) because the Welshes were required to notify AmeriGas and have a company representative check the House's system for leaks any time a new appliance was added, the House was still "being repaired" when the fire occurred.[150]

Courts applying Utah law assess the plain meaning of "insurance contracts by considering their meaning to a person of ordinary intelligence and understanding, viewing the matter fairly and reasonably, in accordance with the usual and natural meaning of the words, and in the light of existing circumstances, including the purpose of the policy."[151]  In addition, "[p]roper contract interpretation includes 'application of ordinary rules of grammar.'"[152]

As explained below, applying these principles to the Welshes' Policy with Safeco, the court concludes a jury could reasonably find that replacement of the heater qualified as a repair, but that no reasonable jury could find the House was still "being . . . repaired . . . at the time of the loss."  Because the plain meaning of the language used in Exclusion 17 is clear, the court will not address Safeco's invitation to apply the "substantial continuing activities" test adopted by other jurisdictions—but so far not Utah—when interpreting policies with similar provisions.[153]

---

[149] Dkt. 23 at 16–17; Dkt. 31 at 9–10; Dkt. 32 at 6–13.

[150] Dkt. 25 at 10–11.

[151] *Doctors' Co. v. Drezga*, 2009 UT 60, ¶ 12, 218 P.3d 598 (quotation simplified).

[152] *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 38, 210 P.3d 263 (quoting *United States v. Werner*, 317 F.3d 1168, 1173 (10th Cir. 2003)).

[153] *See* Dkt. 23 at 13–15; *see, e.g.*, *TRB Invs., Inc. v. Fireman's Fund Ins. Co.*, 145 P.3d 472, 478 (Cal. 2006) ("[T]he proper inquiry for determining whether a building is 'under construction' for purposes of defining an exception to the vacancy exclusion is whether the building project, however characterized, results in 'substantial continuing activities' by persons associated with the project at the premises during the relevant time period.").

### 1. Based on the Undisputedly Unique Nature of the House, Replacing the Propane Heater Qualifies as a Repair

Citing dictionary definitions, the Welshes contend that, for purposes of the "under construction" exception, replacement of the propane heater constitutes a "repair" applying the usual and natural meaning of that word.[154]  Safeco disagrees, pointing to the price tag of the new heating unit and the process Mr. Welsh went through when replacing it.[155]  On the undisputed facts here, a jury could reasonably conclude that replacing the heater was a repair.

The Welshes argue that "neither [they] nor their tenants could live off the grid . . . without a working heating system."[156]  Thus, they contend replacing the heater was necessary to prepare the House "for occupancy as a residence," as required by the "under construction" exception.[157]  In support, the Welshes cite to two dictionaries,[158] which define "repair" as, respectively, "to restore by replacing a part or putting together what is torn or broken"[159] and "to put something that is damaged, broken, or not working correctly, back into good condition or make it work again."[160]

Applying either of these definitions on their face, replacing an appliance used to heat an off-the-grid house would qualify as a repair.  Indeed, Safeco does not challenge the Welshes' proffered definitions of "repair," but nevertheless asserts that a "simple heater exchange does not qualify as a repair to the 'dwelling.'"[161]  Safeco characterizes the action as being "akin to

---

[154] Dkt. 28 at 11–12.

[155] Dkt. 23 at 15–16.

[156] Dkt. 28 at 12.

[157] *See id.*; Dkt. 25 at 10.

[158] Dkt. 28 at 11 & nn. 59–60.

[159] *Repair*, Merriam-Webster, https://www.merriam-webster.com/dictionary/repair (last viewed Dec. 29, 2022).

[160] *Repair*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/repair (last viewed Dec. 29, 2022).

[161] Dkt. 31 at 12 (quoting Exclusion 17).

plugging in a toaster oven."[162]   But on the undisputed facts in the record, a jury could find that replacing the propane heater is not so de minimis as Safeco suggests.  Because the House was off-the-grid, it could only be heated using a wood-burning stove or propane heater.  And the Welshes testified that heat throughout the House was required for the plumbing to function in cold weather.  Thus, replacing the broken unit with another propane space heater took an outsize role of importance at the House.  The cost of the new unit and the steps involved in replacing it are largely irrelevant, as neither of those things factor into the common understanding of a repair.

   Consequently, exchanging a broken heater for a new one could constitute making a "repair" to this dwelling, giving "repair" its "usual and natural meaning," "in the light of existing circumstances" at the House.[163]   Safeco's arguments to the contrary run counter to the plain and ordinary meaning of the word.

   2. *Because the Heater was Replaced More than a Month Prior, No Reasonable Jury Would Find That the House Was Being Repaired at the Time of the Fire*

   Next, it must be ascertained whether the House was "being . . . repaired . . . at the time of the loss" in order for the "under construction" exception to apply.  Safeco argues it was not because the exception uses present-tense language, the heater replacement occurred thirty-six days prior to the fire, and no one had been at the House between those dates.[164]   The Welshes do not dispute this as a factual matter.  Rather, they assert that because AmeriGas had not yet been out to the property to inspect the propane system, the House was still in a state of repair at the time of the fire.[165]   Because the Welshes' view is inconsistent with the natural and ordinary meaning of the operative phrases in the exception, their argument fails.

---

[162] Dkt. 23 at 16.

[163] *See Drezga*, 2009 UT 60, ¶ 12.

[164] Dkt. 32 at 17–18.

[165] Dkt. 25 at 10–11; Dkt. 33 at 6–7.

According to Safeco, the "under construction" exception "contains five unambiguous provisions specifying when the activities would have to take place" to trigger the exception.[166] First, it points out that the exception uses the word "is" when stating that Exclusion 17 does not apply "if the dwelling *is* under construction."[167]  Next, as its name implies, the exception twice uses the phrase "*under* construction," which Safeco contends means "the activities must be ongoing and presently occurring."[168]  Fourth, it uses the present participle "being" right before defining the activities, "remodeled, reconstructed, renovated or repaired."[169]  And fifth, Safeco points out it "requires the activities to be ongoing 'at the time of the loss.'"[170]

Applying the plain meaning and of these phrases and the "ordinary rules of grammar,"[171] the court concludes Safeco's interpretation is correct.  In order for the "under construction" exception to apply based on repairs that are made to the insured dwelling, the repairs must be presently ongoing at the time of the loss.

The Welshes nevertheless contend "the repair of the [House's] heating system was not complete at the time of loss as the new system could not be used until the gas connection had been inspected and certified by AmeriGas."[172]  In support, they look to Mr. Welsh's testimony and the Terms and Conditions of their contract with AmeriGas.  Under the Terms, AmeriGas customers are "required to notify [AmeriGas] in the event that [customers] disconnect the propane system or add or remove appliances so that [the company] may conduct a leak check"

---

[166] Dkt. 32 at 8.

[167] *See id.* (quoting Exclusion 17) (emphasis added).

[168] *See id.* (citing Exclusion 17).

[169] *See id.* (quoting Exclusion 17).

[170] *Id.* (quoting Exclusion 17).

[171] *See Encon Utah*, 2009 UT 7, ¶ 38.

[172] Dkt. 25 at 10.

on the system and leased propane tank.[173]  Mr. Welsh also testified to the typical process he went through when scheduling an AmeriGas representative to check the propane system each season and how he planned on notifying the company at a date closer to when the new tenants were planning to move in.[174]

Thus, the Welshes suggest that their "intentions to have AmeriGas complete its inspection," along with their general obligations under the Terms, are enough to render the House in an ongoing state of repair at the time of the fire.[175]  However, those intentions alone cannot make it so the House was still "being repaired" when the fire occurred.  According to their testimony, the Welshes had not scheduled a time for the system to be inspected, nor had they even notified AmeriGas of the replaced heating unit.[176]  And the Welshes also admit no other repairs were made between the replacement of the heater on March 8 or 9 and the fire on April 14.  With no ongoing physical repairs, such intangible goals to have someone later inspect the House's propane system at some unintended future date simply do not render the House under repair "at the time of the loss."

The Welshes' obligations under the Terms do not change this conclusion.  Even accepting that the Terms "required" the Welshes to "notify" AmeriGas after the heater was installed,[177] that is the extent of the mandatory language found in the document.  The Terms state notification was required "so that [AmeriGas] *may* conduct a leak check" on the system and

---

[173] AmeriGas T&Cs § 3(B).

[174] T. Welsh Depo. at 107:21–108:22.

[175] Dkt. 33 at 7.

[176] *See* T. Welsh Depo. at 118:21–119:24.

[177] *See* AmeriGas T&Cs § 3(B).

leased propane tank.[178]  This permissive language suggests the obligation to notify AmeriGas triggers only the company's ability to conduct a leak check and does not mandate that it do so.

Moreover, there is nothing in the Terms suggesting customers are contractually prevented from operating their propane systems or using the leased equipment until a leak check occurs— the logical corollary of the Welshes' argument.  Although it may be advisable to wait for a leak check to occur before running the heater or other appliances, this is not the same thing as making a system essentially inoperable until it happens.

The only other duty-creating language found in the excerpt of the Terms is that customers are required to furnish AmeriGas "with safe, free and unimpeded access to the Leased Equipment," and that the company has an "irrevocable right of entry . . . to perform any . . . services that the Company deems reasonably necessary."[179]  As with the requirement to notify, this obligation does not make it so customers are unable to use their equipment until a leak check or other service occurs.  Thus, nothing in the AmeriGas Terms can be construed to make it so the House was still "being . . . repaired" up and until a leak check occurred.

Applying the plain meaning and grammatical structure of the "under construction" exception, no reasonable jury could find that the House was still being repaired when the fire occurred five weeks after the propane heater was replaced.  Accordingly, the Welshes cannot establish that the loss was covered under the Policy's plain text.

C.  The Welshes' Argument That a Repair Resets the Sixty-Day Occupancy Timeline Contravenes the Plain Text and Structure of the Policy

The Welshes next argue that "[r]egardless of the 'at the time of loss' language, . . . the 60-day vacancy clock resets when construction [or repair] begins."[180]  In other words, the Welshes'

---

[178] *Id.* (emphasis added).

[179] *Id.* § 3(D).

[180] Dkt. 28 at 14.

contend that the 60-day occupancy period "reset" when the heater was replaced and the fire occurred within this window.[181]  In so arguing, they attempt to circumvent Exclusion 17's plain text under several theories.  None of these arguments are availing.

First, the Welshes contend the "only reasonable reading" of Exclusion 17 is to read it as providing that construction, renovations, or repairs reset the 60-day vacancy clock each time they occur and are completed.[182]  This reading contravenes both the structure and text of Exclusion 17.  The Exclusion applies if the insured property "is rented or held for rental as a residence and has not been occupied as a residence for more than 60 consecutive days immediately before the loss."[183]  It then goes on to define "occupied as a residence" as "the place where an occupant or occupants are living as a primary residence."[184]  The Exclusion also applies if the property is "vacant for more than 60 consecutive days immediately before the loss."[185]

The "under construction" exception is found at the end of Exclusion 17—after the language defining when the exclusion as a whole applies.  Thus, the reading that comports with the text and structure of Exclusion 17 is as follows:  The 60-day clock begins to run as soon as the house becomes vacant or ceases to be occupied as a primary residence.  Once sixty days has been reached, the exclusion is triggered.  The "under construction" exception may then be invoked during that period if the property is "being remodeled, reconstructed, renovated or repaired in preparation for occupancy."[186]  But nowhere does the text suggest that this somehow "resets" the underlying vacancy clock.  The only things that would reset the clock are if the

---

[181] Dkt. 33 at 7.

[182] Dkt. 25 at 14.

[183] Exclusion 17.

[184] *Id.*

[185] *Id.*

[186] *See id.*

subject property becomes reoccupied as a primary residence or is otherwise no longer vacant. The natural reading is that the "under construction" exception is only operative while those activities are ongoing.  As soon as the activities are completed or suspended, the exception no longer applies to prevent Exclusion 17 from being enforced.

To avoid this conclusion, the Welshes cite to *Belich v. Westfield Insurance Co.*, an unpublished case from the Ohio Court of Appeals.[187]  In that case, the court faced a similar (but not identical) 60-day vacancy exclusion and held that "the way the policy is written, even one day of renovation done within the previous sixty days would be sufficient to overcome the vacancy clause."[188]  At first glance, this holding might appear to help the Welshes.  But on comparing the text of the exclusion in *Belich* with Exclusion 17, the case is distinguishable from the situation at hand.

The *Belich* plaintiffs' insurance policy contained a similar exclusion wherein coverage was not provided "[i]f the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs."[189]  But unlike the Welshes' Policy, the policy in *Belich* expressly defined the word "vacant," whereas the Welshes' does not.[190]  And within that definition was a provision that "[b]uildings under construction or renovation are not considered vacant."[191]  Thus, the language and structure of the exclusion in *Belich* are notably different than Exclusion 17.  Under the *Belich* policy, a building is not considered "vacant" for purposes of the exclusion while it is under construction.  The Welshes' policy, by contrast, does not define "vacant" and does not directly tie the "under construction" exception to whether or not

---

[187] Dkt. 25 at 14 (citing No. 99-L-163, 2001 WL 20751, at *3 (Ohio Ct. App. Dec. 29, 2000)).

[188] 2001 WL 20751, at *3.

[189] *Id.* at *2.

[190] *See id.* at *1–2.

[191] *Id.* at *2.

a building is considered occupied.  Instead, it operates to prevent the entire Exclusion from applying—not to change the underlying status of the building as being vacant or occupied. Therefore, unlike the policy in *Begich*, there is no indication that the "under construction" exception here operated to render the House no longer vacant or unoccupied for purposes of the Policy.

Lastly, the Welshes attempt to invoke the "absurd results" canon of construction.[192]  But this canon comes into play only if the court is considering two competing interpretations of an ambiguous provision.[193]  *Burt v. Stringfellow*,[194] the primary case on which the Welshes rely,[195] is instructive in this regard.  There, the Utah Supreme Court articulated the general rules for contractual construction and described situations when the court may consider matters outside of the contract's text, such as absurd consequences or evidence of the parties' intentions:

> In case parties have entered into a contract and differ with regard to its meaning, and the terms of the contract are doubtful or ambiguous, the first duty of the court is to ascertain the actual intention of the parties at the time the contract was entered into. . . . In arriving at a conclusion all the words and expressions used by the parties in the contract must be given full force and effect, unless to do so leads to an absurdity or is contrary to the manifest purpose and intention of the parties. *Of course, where the language is clear, and all the terms of the contract are explicit and certain, it is not open to construction.*[196]

---

[192] Dkt. 28 at 13–14; Dkt. 25 at 13–14; Dkt. 33 at 5–7; *see, e.g.*, *The View Condo. Owners Ass'n v. MSICO, L.L.C.*, 2004 UT App 104, ¶ 28 n.1, 90 P.3d 1042 (refusing to interpret a real estate covenant in a way that "could potentially create absurd results"); *accord Okelberry v. W. Daniels Land Ass'n*, 2005 UT App 327, ¶ 24, 120 P.3d 34 (citing *The View* to support conclusion that it could "not endorse" the plaintiff's "absurd interpretation" of a disputed contract provision).

[193] *See, e.g.*, *LDS Hosp., Div. of Intermountain Health Care v. Capitol Life Ins. Co.*, 765 P.2d 857, 858–59 (Utah 1988) (when discussing the resolution of ambiguities in an "exclusionary clause contained in an insurance policy," adopting rule from another jurisdiction that "[a] construction which contradicts the general purpose of the contract or results in a hardship or absurdity is presumed to be unintended by the parties" (quoting *Phil Schroeder, Inc. v. Royal Globe Ins. Co.*, 659 P.2d 509, 511 (Wash. 1983))); *see also Phil Schroeder*, 659 P.2d at 511 (noting this and other canons "are principles that are not confined to Washington law, but are of nationwide application").

[194] 143 P. 234, 236 (Utah 1914).

[195] Dkt. 28 at 13 n.67 (citing *Burt*, 143 P. at 236); Dkt. 25 at 13 n.51 (citing *Burt*, 143 P. at 236).

[196] *Burt*, 143 P. at 236 (emphasis added).

Thus, where there is no ambiguity, the court cannot consider whether strictly following the language of a contract leads to an absurd result.[197]  And for the reasons stated above, the parties have not raised an ambiguity with respect to any of the terms found in Exclusion 17. Accordingly, the absurd results canon cannot be applied to this case.[198]

None of the Welshes' arguments compel the court to ignore the plain text and structure of Exclusion 17.  Consequently, they have not established that a repair resets the 60-day vacancy timeline to trigger Exclusion 17's applicability to the loss of their House.

## III.    Safeco is Entitled to Summary Judgment on the Welshes' Remaining Claims

In their Opposition to Safeco's Motion, the Welshes responded to Safeco's arguments on their intentional infliction of emotional distress and negligent misrepresentation claims by conceding that they cannot maintain those claims at this stage of the case.[199]  Therefore, Safeco is entitled to judgment as a matter of law on these two claims.

---

[197] *Id.*; *accord LDS Hosp.*, 765 P.2d at 858–59; *Glenn v. Reese*, 2009 UT 80, ¶¶ 13–16, 225 P.3d 185 (when facing two differing interpretations of a real estate contract, concluding that the language is "unambiguous and can be interpreted as a matter of law" because "the plain language of the contract allows no other reasonable interpretation" than the one proposed by the defendants, and adding that their "interpretation allows each provision to have effect and does not produce absurd or harsh results").

[198] The court is aware that, if it were interpreting a statute under Utah law, this would not necessarily be the outcome.  In the statutory interpretation context, Utah "recognizes two different interpretive tools concerning absurdity": the "absurd consequences canon" and the "absurdity doctrine."  *Utley v. Mill Man Steel, Inc.*, 2015 UT 75, ¶ 46, 357 P.3d 992 (Durrant, C.J., concurring).  The absurd results canon, similar to how it is used when interpreting contracts, is only applied "to resolve ambiguities in a statute."  *Id.*  "The absurdity doctrine, by contrast, has nothing to do with resolving ambiguities. Rather, [courts] apply this canon to reform unambiguous statutory language where applying the plain language leads to results so overwhelmingly absurd no rational legislator could have intended them."  *Id.*

So far as this court is aware, there is not an absurdity doctrine analog in Utah contract law jurisprudence. Moreover, when the doctrine is invoked in the statutory interpretation context, the Utah Supreme Court has cautioned it is "a drastic step" that is "not to be administered lightly."  *Id.* ¶ 48 (quotation simplified).  Accordingly, without clear indication from the Welshes—or from the court's own review—that the absurdity doctrine can be invoked in the contract context to overcome unambiguous text, let alone that this case presents a "compelling justification" to invoke it, *see id.* ¶ 47, the court declines to apply the absurdity doctrine here.

[199] *See* Dkt. 28 at 18 (stating the Welshes' intention to "dismiss their claims for intentional infliction of emotional distress and negligent misrepresentation"); Dkt. 31 at 1, 20 (characterizing this as a concession that the court "should grant summary judgment to Safeco" on these two claims).  Counsel for the Welshes confirmed at oral argument that they conceded to Safeco being granted judgment as a matter of law on these two claims.

In addition, at oral argument, counsel for the Welshes conceded that if their contractual claim fails, their negligent infliction of emotional distress claim necessarily fails as well because the negligent act on which that claim is premised presumes that Safeco mishandled the Welshes' insurance claim.[200]  Consequently, because the court has already concluded the loss of the House was not covered under the Policy's plain language, it follows that Safeco did not negligently mishandle the Welshes' claim.  That conclusion, coupled with the concession at oral argument, means the negligent infliction claim fails on that basis alone.  Accordingly, the court will not directly address the arguments in the parties' briefing as to the negligent infliction claim.  Thus, Safeco is entitled judgment as a matter of law on the Welshes' negligent infliction of emotional distress claim as well.

## CONCLUSION

Based on the undisputed material facts in the record, no reasonable jury could find for the Welshes on their breach of contract claim.  The Welshes have not established that any part of Exclusion 17 is ambiguous.  And based on the plain and ordinary meaning of the text in the "under construction" exception, the Welshes' House was not "being . . . repaired . . . at the time of the loss."  Lastly, none of the Welshes' arguments to read the exception as resetting the 60-day vacancy timeline each time there is a repair allow them to avoid the conclusion reached by applying the plain text.  As to the Welshes' other three claims, based on the concessions in their briefing and at oral argument, these all fail as well.  Accordingly, the Welshes' Motion for Partial Summary Judgment[201] is DENIED and Safeco's Motion for Summary Judgment[202] is

---

[200] *See Straub v. Fisher & Paykel Health Care*, 1999 UT 102, ¶ 14, 990 P.2d 384 ("A plaintiff cannot recover for negligent infliction of emotional distress unless the plaintiff is a direct victim of the defendant's negligence."); *see also Mower v. Baird*, 2018 UT 29, ¶¶ 79–85, 422 P.3d 837 (describing the multipart standard to determine whether the defendant owed the plaintiff a cognizable duty to support a claim for negligent infliction of emotional distress).

[201] Dkt. 25.

[202] Dkt. 23.

GRANTED.  Safeco is entitled to judgment as a matter of law on all four of the Welshes' claims.

The Clerk of Court is directed to close the case.

SO ORDERED this 27th day of February 2023.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge